**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Kevin O'Leary and Paul Palandjian,

     Plaintiffs,

v.

John Oleske, Law Office of John Oleske,
and Melissa Brandao

     Defendants.

_____/

---

**COMPLAINT AND DEMAND FOR JURY TRIAL**

---

1

## INTRODUCTION AND NATURE OF CASE

1.    This is an action for abuse of process and malicious prosecution arising from Melissa Brandao and John Oleske's deliberate misuse of the federal courts as a publicity weapon. In July 2025, Defendants filed a sensational, sprawling lawsuit in the District of Colorado accusing Kevin O'Leary and Paul Palandjian, (among others) (together the "O'Leary Parties" and each an "O'Leary Party") of extraordinary misconduct—racketeering-style conspiracy, fraud, and other wrongdoing—without facts tying them to any actionable conduct. The case was not brought for proper legal purposes. It was brought to generate headlines, inflame public attention, and inflict reputational and financial harm on highly visible public-facing individuals.

2.    The "theory" of the underlying lawsuit (the "Underlying Action") was internally contradictory from the start. Brandao and Oleske's own pleading described an alleged shareholder and management dispute at the company HerdDogg Inc. ("HerdDogg") that began years before the O'Leary Parties had any involvement with the company. The complaint claimed misconduct by HerdDogg insiders (the "HerdDogg Parties") from 2019–2022, yet offered no plausible facts showing any participation by the O'Leary Parties—who were, at most, later outside investors beginning in 2023.

3.    Defendants even conceded they could not determine whether the O'Leary Parties were victims of the alleged wrongdoing or became participants, then nevertheless pivoted—without evidentiary support—to accuse them of being "co-conspirators" and "join[ing] the scheme by investing in HerdDogg and aligning with its insiders" Then, Defendants  leveled claims against the O'Leary Parties for conduct that predated their involvement with HerdDogg.

2

4.      To manufacture a hook for their accusations, Brandao and Oleske relied almost entirely on a single alleged phone call in which Oleske purportedly relayed accusations to Mr. Palandjian about "fraudulent patent assignments and other material misrepresentations made by HerdDogg to investors and regulators." From that lone interaction, Brandao and Oleske leapt to the extraordinary claim that the O'Leary Parties joined a sweeping fraudulent enterprise—despite pleading no detailed facts showing any agreement, any predicate acts, any knowing misrepresentation by the O'Leary Parties, or any causal link between them and events that allegedly occurred long before their investment:

5.      Worse still, the Underlying Action was built around a central factual premise that was false: the claim that Ms. Brandao's signature was "forged" on patent-assignment documents through unlawful access to her accounts. Contemporaneous documentary evidence contradicted that narrative, reflecting Ms. Brandao's direct participation in the assignment process, her receipt of the documents in real time, her execution through DocuSign, and her own communications confirming she signed and directed aspects of the process. The "forgery" story was not a reasonable inference from ambiguous facts— it was a fabricated premise used to reframe routine intellectual-property assignments into fraud claims.

6.      Even more outrageous, explosive claims leveled against the O'Leary Parties were contradicted by the Complaint's own factual allegations. The Underlying Action alleged the O'Leary Parties became involved with HerdDogg years after Brandao's patents were allegedly stolen through forged records by HerdDogg insiders, but

3

Defendants nonetheless leveled (and refused to dismiss) claims against the O'Leary Parties for this conduct, including theft, conversion, patent infringement, and fraud.

7.      Having filed a complaint that was contradictory, full of rhetoric, and contained no plausible facts in support of the allegations, Brandao and Oleske's intentions were then revealed: they simultaneously delayed the case from moving forward while engaging in a media smear campaign against Kevin O'Leary. Brandao and Oleske failed to take basic steps to move the action forward, including missing service deadlines and delaying the issuance of summonses. At the same time, Brandao and Oleske amplified their accusations through a sustained social-media campaign—repeatedly branding Mr. O'Leary a "fraud," insinuating criminality, and promoting media coverage to maximize reputational damage while the allegations remained untested.

8.      The O'Leary Parties nevertheless acted responsibly and promptly. Despite Brandao and Oleske's failure to timely serve them, the O'Leary Parties voluntarily appeared, sent a Rule 11 safe-harbor letter placing Brandao and Oleske on notice that the claims lacked factual and legal support and appeared to be pursued for an improper purpose, including that the bulk of the factual allegations preceded the O'Leary Parties' involvement and therefore they could not be liable for many of the claims. Brandao and Oleske refused to withdraw, narrow, or correct their allegations, and refused to dismiss any claim. The O'Leary Parties then moved to dismiss and sought sanctions—again attempting to end the abusive litigation efficiently and on the merits.

9.      When confronted in court, Brandao and Oleske could not substantiate their accusations. In court, Oleske was pressed to identify what specific documents were

4

allegedly forged or "impossible" for Ms. Brandao to have signed, but he was unable to provide a coherent answer.

10.     Brandao and Oleske compounded the abuse by failing to respond to multiple motions to dismiss and motions for sanctions, which delayed the inevitable dismissal of the Underlying Action. The delay was so egregious, and the allegations so outrageous, that the district court issued Brandao and Oleske a show-cause order, citing concern about the veracity and validity of the claims and warning that continued noncompliance of deadlines and court orders would result in a dismissal with prejudice.

11.     The Underlying Action ultimately terminated in the O'Leary Parties' favor with a dismissal with prejudice—an outcome consistent with what the record showed from the outset: Brandao and Oleske lacked probable cause and acted with malice.

12.     Despite the dismissal, Brandao continues to publicly harass Mr. O'Leary. In the last two weeks, she has released two videos calling the proceedings before the Court a "phantom opera that whole thing was…how propped up it was." Brandao closed with statements signaling her intent to continue harassing Mr. O'Leary: "You think you're above the law, but you're not," and "It's time…for a reckoning."[1] The thumbnail for one of the videos is below.

---

[1] https://www.youtube.com/watch?v=xLsJWKjxBE8&t=2s;
https://www.youtube.com/watch?v=Tbq6FZBvQi0&t=5s



I will NOT be erased, Mr. O'leary

150 views · 2 weeks ago

13.    As a direct and proximate result of this wrongful institution and malicious maintenance of proceedings, the O'Leary Parties' have suffered substantial damages, including significant attorneys' fees and costs, diversion of executive time, business disruption, and severe reputational injury requiring mitigation. This suit seeks to hold Brandao and Oleske accountable for weaponizing the judicial process to generate publicity, harass the O'Leary Parties, and cause precisely the harm the tort of malicious prosecution exists to remedy.

## THE PARTIES

14.    Plaintiff Kevin O'Leary is a citizen of Canada and resides in Toronto. O'Leary first achieved prominence through SoftKey Software Products, a company he co-founded in 1986 and successfully grew into a global software powerhouse. In 1999, he sold SoftKey to Mattel for $4.2 billion, solidifying his reputation as a visionary leader and credible business figure. Since 2009, O'Leary has been a star on the hit television series Shark Tank, where his astute investment insights and sharp negotiating skills earned him

a dedicated audience and the nickname "Mr. Wonderful." Today, as Chairman of O'Leary Ventures, he actively oversees a diverse portfolio of startups, leveraging the reputation he has meticulously cultivated over decades.

15.    Plaintiff Paul Palandjian resides in Miami, Florida.

16.    Defendant John Oleske is an individual and resides in New Paltz, New York.

17.    On information and belief, Defendant the Law Office of John Oleske is a sole proprietorship.

18.    Defendant Melissa Brandao is an individual who resides in Montana. She allegedly founded HerdDogg, a company that made ear tag livestock technology.

## JURISDICTION AND VENUE

19.    Jurisdiction of the federal district court is proper under 28 U.S.C. § 1332 as the Plaintiff and the Defendants are citizens of different states.

20.    Plaintiffs' claims exceed the sum of $75,000, exclusive of interest and costs, therefore jurisdiction of the Court is proper under 28 U.S.C. § 1332.

21.    This Court has personal jurisdiction over Defendants under the Colorado long-arm statute, Colo. Rev. Stat. § 13-1-124 and the Due Process clause of the United States Constitution because, as further described below, Defendants committed tortious acts directed to Colorado and Defendants knew and intended such injuries to occur in Colorado.

22.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District. The Underlying Action was filed and litigated in this District and Plaintiffs' malicious prosecution and abuse of process claims arise directly from that litigation.

Defendants' harassing and false statements about Plaintiffs concerned, publicized, and republished allegations arising from that Underlying Action, and Defendants knew and intended that those statements would be read by persons in Colorado and would cause injury connected to proceedings in this District.

## FACTUAL ALLEGATIONS

### A. The Underlying Action Rested on Demonstrably False Allegations and Brandao and Oleske Failed to Plead Any Particularized Facts Linking the O'Leary Parties to Misconduct.

*The Underlying Action Theory*

23.    On July 22, 2025, Brandao—through Oleske—filed a sprawling and baseless federal civil action in the District of Colorado, Civil Action No. 1:25-cv-02254-GPG-NRN, naming among others, HerdDogg, many of its executives, and the "O'Leary Parties". *See* Ex. A (Complaint).

24.    Stripped of its rhetoric, the Complaint in the Underlying Action described a shareholder dispute between a disgruntled founder and her former company that occurred years before the O'Leary Parties became involved with HerdDogg.

25.    Brandao allegedly founded HerdDogg in 2015. The O'Leary Parties oversaw an investment vehicle called Wonder Fund North Dakota, LLLP ("Wonder Fund"). They were tasked with overseeing investment of North Dakota funds into small businesses. The O'Leary Parties chose to invest some of those funds into HerdDogg.

26.    The Underlying Action was premised upon a sensational falsehood: that Brandao's signature was "forged" in 2021 on two patent-assignment documents, the purported assignments were used to oust her from HerdDogg, and investors were later defrauded based on HerdDogg's claimed patent ownership.

8

27.    Even if that forgery story were true (it was not as further explained below), it did not connect the O'Leary Parties to any wrongdoing. As pled, each claim against the O'Leary Parties rested almost entirely on a single phone call—after the alleged patent events and before/around Wonder Fund's investment—during which Oleske allegedly relayed the "fraudulent patent assignments" accusation to Mr. Palandjian.

28.    From that lone call, Defendants spun a conspiracy theory: because Mr. Palandjian allegedly did not respond as counsel preferred (including declining to facilitate direct contact with Mr. O'Leary), Defendants alleged Mr. Palandjian—together with Mr. O'Leary, O'Leary Ventures, and Wonder Fund—joined a sweeping racketeering enterprise and a Colorado Organized Crime Control Act ("COCCA") conspiracy.

29.    The Complaint alleged no particularized facts plausibly supporting liability against any of the O'Leary Parties for anything, much less facts showing they joined a racketeering enterprise and engaged in fraud.

*The Complaint's Contradictions and Lack of Particularized Facts Eliminated Any Good-Faith Basis for Probable Cause Against the O'Leary Parties.*

30.    Brandao claimed she founded HerdDogg in 2015, years before the O'Leary Parties had any connection to the company.

31.    Brandao further claimed that by 2019, certain HerdDogg officers or executives had already formed a plan to push her out of management and ownership. The Complaint described internal workplace disputes between Plaintiff and those executives during a period when the O'Leary Parties were not alleged to have been involved with HerdDogg in any capacity.

9

32.     Defendants then alleged that in 2021, certain HerdDogg executives unlawfully accessed her email and used that access to forge her signature on a patent assignment (a falsehood as explained below).

33.     Defendants further alleged Brandao was removed from HerdDogg in 2022. Defendants then claimed that throughout 2023 and 2024, certain HerdDogg executives— again, not the O'Leary Parties—made material misrepresentations to prospective investors, including allegedly misrepresenting that HerdDogg had a signed termination agreement releasing Plaintiff's claims and that the company held good title to the inventions at issue.

34.     Nearly six years after the alleged misconduct supposedly began, Defendants alleged that the O'Leary Parties entered the picture as outside investors. Defendants claimed that, through Wonder Fund, the O'Leary Parties invested funds from the State of North Dakota in HerdDogg "[i]n or around 2023 and continuing into 2024"— well after the events Brandao says triggered her dispute.

35.     Critically, Defendants admitted that the O'Leary Parties arrived on the scene after the supposed patent theft and thus could not be ruled out as victims: "Plaintiff cannot determine whether Wonder Fund was originally a *victim* of this fraud, in that it was originally unaware of Defendants' false and misleading statements about the Company possessing a release from liability from Plaintiff and good title to the Stolen Inventions…" Ex. A at ¶ 102.

36.     Even while acknowledging that the O'Leary Parties where not involved with, and may have been victims of, the alleged misconduct, the Complaint abruptly pivoted and accused them—without any supporting facts—of "coordinating" with HerdDogg

10

insiders to defraud the State of North Dakota and related entities through Wonder Fund funding. The pleading never identified what that coordination supposedly entailed, who participated, when it occurred, what false statement the O'Leary Parties allegedly made, or how Brandao had standing to sue over alleged harm to third parties.

37.     Lacking any concrete facts, the Complaint attempted to manufacture one from a single phone call whereby Oleske allegedly called Palandjian, relayed accusations of the patent forgery, and sought engagement from Palandjian. Defendants then treated Palandjian's alleged failure to take "corrective" action—along with his alleged refusal to review more information or facilitate direct contact with O'Leary—as the triggering event that supposedly converted the O'Leary Parties into participants in a sweeping fraudulent scheme: "From that moment forward, Defendants O'Leary and Palandjian became direct participants in the fraudulent scheme to defraud Plaintiff and misappropriate her inventions and equity interest in HerdDogg." Ex. A at ¶ 114.

38.     From there, the pleading collapsed into collective allegations, repeatedly referring to "Defendants" as a monolith and indiscriminately attributing liability to the O'Leary Parties for conduct that, according to the Complaint itself, occurred years before the O'Leary Parties had any involvement with HerdDogg. Despite alleging that the purported conspiracy, patent assignments, and Brandao's removal from the company all predated the O'Leary Parties' investment, Brandao and Oleske nevertheless asserted that the O'Leary Parties were liable for those same acts and had somehow joined the alleged racketeering enterprise—without pleading particularized facts showing any agreement, participation, knowledge, or actionable conduct by any O'Leary Party. The

Complaint instead relied on conclusory allegations and group pleading to impose liability on the O'Leary Parties for events that allegedly occurred before they entered the picture.

39.    On these facts, Brandao and Oleske lacked probable cause. No reasonable litigant or attorney could, in good faith, conclude that the O'Leary Parties engaged in the fraudulent trafficking in a password, patent forgery, conversion, theft, fraud, and other alleged misconduct where the Complaint itself alleged that the underlying events occurred years before the O'Leary Parties became involved with HerdDogg.

40.    Nor could any reasonable litigant or attorney, in good faith, believe the O'Leary Parties engaged in racketeering or a COCCA conspiracy simply because an O'Leary Party apparently did not credit the patent theft allegations, especially given the Complaint's threadbare theory and its glaring internal contradictions.

41.    The Complaint's own chronology foreclosed any plausible inference that the O'Leary Parties participated in, directed, or were otherwise responsible for the alleged wrongdoing, yet Brandao and Oleske nevertheless asserted fifteen claims against them based on conclusory allegations, collective pleading, and speculation rather than particularized facts.

42.    Worse still, the premise driving the case against all the Defendants (both the O'Leary Parties and the HerdDogg Parties), the supposed forgery of Brandao's signature, was false.

*The Core Forgery Allegation Was False*

43.    Defendants' Complaint was built on a single, central allegation: that HerdDogg and its principals "forged" her electronic signature on patent assignment documents by unlawfully accessing her email and DocuSign accounts. That allegation

was affirmatively contradicted by contemporaneous documentary evidence showing Brandao's knowing participation in the patent-assignment process, her repeated receipt of the allegedly "forged" documents, and her express admissions that she personally signed them.

44.     The forgery narrative was therefore not a misunderstanding or inference; it was a fabricated factual premise designed to convert routine intellectual-property assignments into a fraud scheme.

45.     The record shows that the "forgery" narrative was false from the outset, and Oleske was later put on clear notice of that fact, including through a Rule 11 letter described below.

46.     As early as May 2021, HerdDogg's outside patent counsel communicated directly with Brandao about preparing, executing, and filing patent assignments identifying HerdDogg as the assignee. Ex. B. Brandao received draft assignments, forwarded them for DocuSign execution, and signed them within minutes. Ex. C. The DocuSign receipts reflected execution activity tied to specific IP addresses, and counsel promptly acknowledged receipt and filing of the signed documents. Ex. D. Brandao then received follow-up emails attaching the executed assignments and confirming their recordation with the USPTO, providing repeated notice of the very transactions she later recast as secret forgeries. Ex. E.

47.     Despite this paper trail, Brandao alleged years later that she did not discover the purported forgery until December 2023. That claim was flatly inconsistent with the record. The same documents she later labeled "fraudulent" were emailed to her repeatedly in real time, attached to filing confirmations, and referenced in HerdDogg

materials she continued to help prepare after the assignments were completed. The forgery allegation thus required Brandao to deny not only the authenticity of her signature, but the authenticity of the entire course of dealings surrounding the patents, none of which were concealed from her.

48.     The December 2021 assignment relating to the second patent further exposed the falsity of Brandao's narrative. That record showed Brandao personally instructing her assistant to load documents into DocuSign so she could sign remotely, actively troubleshooting DocuSign access, and supplying verification codes in real time. Ex. F.

49.     When Brandao noticed an error in her corporate title, she halted execution, demanded corrections, and refused to sign until the documents were revised. Ex. G. Her conduct was wholly incompatible with the claim that others were secretly forging her signature. After the corrected documents were sent, Brandao signed them and later confirmed in writing: "I signed them already two days ago." Ex. F at 6.

50.     As further explained below in Section C, all of this evidence was transmitted to Brandao and Oleske in a Rule 11 Safe Harbor Letter (Dkt. # 26) which requested that Brandao and Oleske drop the case. They refused.

51.     Further, as described below in Section D, when Oleske was pressed to identify which specific documents were allegedly forged, manipulated, or impossible for Brandao to have signed, Oleske could not do so. Ex. H.

**B.  <u>Defendants Acted with Malice by Using the Lawsuit as a Publicity Stunt and Failing to Prosecute.</u>**

52.     Instead of litigating the Underlying Action, requesting issuance of summonses, serving discovery, or even doing the bare minimum of responding to any of

the motions to dismiss or motions for sanctions, Brandao and Oleske devoted their attention to social media, where they publicly disparaged O'Leary and repeatedly shouted "fraud," seemingly to harass and pressure a celebrity defendant into paying nuisance value simply to make the noise stop.

53.    Although the Underlying Action was filed in late July 2025, Defendants did not timely serve the O'Leary Parties by the October 22, 2025 deadline. That failure underscores their motive. They were not trying to litigate this case on the merits, but to weaponize it as harassment.

54.    Indeed, Defendants did not obtain summonses from the Clerk until after the service deadline had already expired.

55.    During the same period when they should have been prosecuting the Underlying Action in court, Brandao and Oleske instead launched a sustained, harassing social media campaign against the O'Leary Parties (collectively posting over thirty times), as evidenced by the illustrative social media posts below.

56.    On July 22, 2025, Oleske posted his lawsuit on the platform X and accused O'Leary of mismanaging North Dakota funds.



57. On that same day, Oleske posted another tweet:

16



58.     On that same day, Oleske's extrajudicial statements about the case continued with the following post:



59.    The next week, Oleske continued his tweetstorm, posting a Law360 article about his lawsuit and disparaging O'Leary, claiming O'Leary was a misogynist:



60.     A few minutes later, Oleske posted on X and suggested that O'Leary was on Jeffrey Epstein's Island:



**Kelly D** 🇺🇸🇺🇦🇨🇦🏳 @KellDA · Jul 29, 2025
Was Kevin O'Leary on the island?

💬 146          ⟲ 98          ♡ 845          📊 19K          🔖 ⬆

**John Oleske** ✓
@JohnOleske

Good question, but also worth asking—just what exactly *has* Kevin O'Leary been doing with the $45 million in US Treasury small business grants he's been managing for North Dakota(!)

Spoiler...



11:04 PM · Jul 29, 2025 · **624** Views

61.    Forty-five minutes later, he continued to suggest O'Leary was a misogynist:

20





**John Oleske** ✔  @JohnOleske

Nobody seems to know that Kevin O'Leary has been "managing" $45 million in US Treasury small business grants for the State of North Dakota.

Can you guess whether he's used that position of power to promote female entrepreneurs, like he congratulates himself for on Shark Tank?

**Founder Accuses Execs, Kevin O'Leary Of Patent Forgery**

By Zach Dupont

Law360 (July 24, 2025, 8:54 PM EDT) -- The founder of an agriculture technology company has sued the company she created, several of its executives and Kevin O'Leary of "Shark Tank" in Colorado federal court, alleging the defendants stole her company and intellectual property.

Melissa Brandao's complaint, filed Tuesday, says she formed HerdDogg Inc. in Colorado in 2015 when she created technology to digitally monitor livestock ear tags and alleges that after she was ousted from the company she created, HerdDogg obtained $15 million in fraudulent investments, including from the states of North Dakota and Nebraska.

"At its core, the scheme involves the fraudulent misappropriation of intellectual property, the coercive ousting of the company's founder, and the continued pursuit of state and federal economic development funds through materially false representations," Brandao's complaint says.

Brandao says the scheme began in 2019 when HerdDogg's board of directors asked that the company hire a CEO to allow Brandao to focus on product development. Brandao claims that the new hire, Lou Faust, was a "complete charlatan" who misrepresented his experience as the CEO of a previous agriculture startup, Agribotix Inc., where he claimed he negotiated a successful exit acquisition for the founder.

"The purported exit acquisition he claimed to have engineered was in fact merely a fire-sale absorption of the remnants of Agribotix, Inc., a dying business he had driven into the ground," Brandao says.

Brandao alleges Faust used his position to pack the company with new executives and board members, and eventually the company fired her in August 2022 without compensation, leaving her with a less than 10% share in the company she created.

She claims that in 2021, company executives accessed her email to forge her electronic signature on two patent filings to assign the patents to HerdDogg, which she says she never intended to do.

"She knows she didn't do it, she knows that she was traveling both times and was not signing a DocuSign agreeing to these things," Brandao's attorney, John Oleske, told Law360. "They did not have that right. ... They didn't come to her and say 'we want you to assign this.'"

Spokespersons for HerdDogg and O'Leary's businesses did not immediately respond to requests for comment Thursday.

Brandao says she didn't discover the fraud until late 2023 and that during a call weeks before her firing, two HerdDogg board members fraudulently omitted disclosing the information about the patents.

During the call, Brandao says she told the board members "she had not assigned the patents relating to the stolen inventions to the company, and would not be inclined to do so outside the context of an acceptable global settlement allowing for her amicable separation from the company."

The amicable separation from the company never happened, and Brandao was fired with no knowledge that her patents were stolen, according to her complaint.

Since her departure from the company, Brandao alleges that HerdDogg has made several "fraudulent representations" about the company to investors, including the states of North Dakota and Nebraska, to induce $15 million in investment across several rounds of fundraising.

In addition to making fraudulent representations about ownership of the patents, Brandao claims HerdDogg lied to investors by claiming she signed nonsolicitation and noncompete agreements and by claiming HerdDogg had a product generating revenue when internally the company knew its products had a failure rate of 60% or more and was purchasing "several million dollars" of needless raw materials to inflate inventory value.

"These purchases were subsequently reclassified as finished goods inventory, despite the absence of any clear sales pipeline, order fulfillment activity, or documented commercialization efforts," Brandao says. "The company's claimed inventory grew significantly, but without corresponding increases in accounts receivable, product revenue, or customer engagement."

Brandao also claims HerdDogg lied to the state of North Dakota by saying it "maintained meaningful operations or employment activity" in the state. In reality, Brandao says HerdDogg hired "at most one or two remote support workers in the state" and in 2023 outsourced all manufacturing operations to an unknown vendor in Mexico.

"The company has failed to identify its offshore manufacturing partner or provide documentation justifying the volume or pricing of these raw material purchases, despite the absence of meaningful revenue, sales, or production throughput," Brandao says.

Brandao says that O'Leary and his businesses — O'Leary Ventures Management LLC and Wonder Fund North Dakota LLLP — became perpetrators of the scheme when her counsel spoke to O'Leary Ventures CEO Paul Palandjian to inform him of HerdDogg's ongoing fraud.

According to the complaint, Wonder Fund was given $45 million from the state to invest in small businesses through the U.S. Treasury's State Small Business Credit Initiative. Wonder Fund gave an undisclosed amount of this money to HerdDogg in 2023, and Brandao says when her counsel confronted Palandjian with information about the scheme he became "defensive and accusatory" and said Brandao would not be allowed to speak to O'Leary directly.

"My client was someone who believed in O'Leary and specifically admired his public championing of women entrepreneurs and inventors," Oleske said. Palandjian "displayed less than zero sympathy, or empathy, or concern for the founder of the company."

Brandao says that the $15 million in investment in HerdDogg isn't going toward improving the company, but rather towards "inflated salaries and bonuses" for executives and to "fraudulently inflate HerdDogg's value in order to obtain additional investor capital."

Brandao brings 15 causes of action against HerdDogg and others including violations of the Racketeer Influenced and Corrupt Organizations Act, the Computer Fraud and Abuse Act and the Colorado Organized Crime Control Act. Brandao seeks $50 million in compensatory damages as well as a declaration from the court that she is the sole owner of the patents.

Brandao is represented by John Oleske of the Law Office of John Oleske.

Counsel information for all defendants was not immediately available Thursday.

The case is Brandao v. HerdDogg, Inc. et al., case number 1:25-cv-02254, in the U.S. District Court for the District of Colorado.

--Editing by Brian Baresch.

11:17 PM · Jul 29, 2025 · **472** Views

62.  Two days later, he accused O'Leary of "stealing [Brandao's] company/inventions", an allegation that had no basis in fact and was contradicted by the Complaint filed days earlier alleging that this conduct occurred before the O'Leary Parties' involvement with the company. Ex. A at ¶¶ 59-85:



63.    The next day, Oleske again accused O'Leary of "helping to steal" Brandao's patents, a claim that was obviously false as discussed above as no forgery ever occurred, and, even if it had, no O'Leary Party had any relationship to HerdDogg during the time of the alleged forgery.



**John Oleske** ✓
@JohnOleske

O'Leary talks a big game for a guy who got sued in federal court last week for misusing his power over $45 million in US Treasury small-business grants to help steal my client Melissa Brandao's patents & the company she founded.

12:14 PM · Aug 1, 2025 · **5,195** Views

64.     A few hours later, he again claimed that O'Leary helped to steal Brandao's inventions:



65.    An hour after that, Oleske resumed the tweetstorm—this time turning his fire on Palandjian, while seemingly acknowledging that the "forgery/patent-theft scheme" predated the O'Leary Parties involvement and investment into HerdDogg

24



**John Oleske** ✔
@JohnOleske

I had bad news for O'Leary Ventures' CEO.

I told him they had been defrauded into investing small-biz grant $ from the US Treasury in a forgery/patent-theft scheme targeting my client, inventor/rancher Melissa Brandao.

He said never call again.

OK, but you can't shoot PACER:



5:33 PM · Aug 1, 2025 · **742** Views

66.    A few weeks later, Oleske still had not requested summonses or taken any steps to serve the O'Leary Parties while publicly declaring O'Leary was "grifting" from the government:

 **John Oleske** ✔
@JohnOleske

Wonder if TV's most hated *Canadian*

Kevin O'Leary

Will get to stay in line ahead of both debt payments & rebate checks for more of those sweet, sweet government gravy payoffs he's been grifting from the US Treasury & North Dakota.

I'm gonna bet yes bc that's how it is now.



11:42 AM · Aug 22, 2025 · **44** Views

67.    About a week later, on August 27, 2025, Oleske again took to social media. He still had not requested summonses or otherwise taken steps to move the Underlying Action forward, but he continued to state O'Leary was "mismanaging" government funds:

26



68.     The posts above are only illustrative—altogether, Oleske tweeted more than thirty times about "his" lawsuit while taking virtually no steps to prosecute it. For months, he used the Underlying Action as a vehicle to court media coverage and public attention, amplifying accusations online while leaving the case to languish in court.

69.     And his client, Brandao, did the same thing. Brandao's decision to accuse HerdDogg and Kevin O'Leary of "forgery" was accompanied from the outset by a calculated effort to publicize the allegation.

70.     On July 25, 2025, within days of filing the Complaint, Brandao promoted a Law360 article headlined *"Founder Accuses Execs, Kevin O'Leary of Patent Forgery,"*

and though Brandao alleged the patent theft occurred before O'Leary's involvement in the company, she framed the lawsuit on X.com as exposing "the truth" about supposed "lies, corruption, fraud and abuse."



71.    By amplifying that headline herself, Brandao distilled the litigation into a sensational accusation of criminal wrongdoing, despite the extensive contemporaneous record showing her knowing participation in the patent-assignment process and her repeated confirmation that she signed the documents at issue, all of which occurred years before any O'Leary Party had any involvement with HerdDogg.

72.    Brandao then escalated the rhetoric to personal and reputational attacks. On August 28, 2025, she publicly declared that Kevin O'Leary was "a fraud," asserting corruption and misuse of taxpayer funds "to bail you out," and claiming unique personal knowledge of such wrongdoing.



73.     While failing to prosecute the Underlying Action, Brandao escalated her public accusations, transforming her already baseless forgery allegations into a broader narrative of government corruption, fraud, and misuse of taxpayer funds. In November 2025, Brandao publicly proclaimed that O'Leary and O'Leary Ventures were being sued for fraud and for "laundering public money in North Dakota." That statement was false. The Underlying Action contained no factual basis for accusing Plaintiffs of laundering public money, and Brandao's statement conveyed to readers that Plaintiffs had engaged in criminal misconduct involving public funds. By publicly advancing those accusations as fact, Brandao amplified the reputational harm caused by the Underlying Action while continuing to neglect its prosecution.



74.    While failing to prosecute the case and, as explained below, failing to respond to the motions to dismiss and motions for sanctions, Brandao publicly asserted that U.S. Treasury funds allocated for COVID relief had been invested "fraudulently" and without regard for taxpayers. She again tied those accusations to HerdDogg, O'Leary, and the Wonder Fund, despite the absence of any adjudicated finding or evidentiary support.



75.    Defendants did far more than merely report that the Underlying Action had been filed. Instead, Defendants repeatedly adopted, endorsed, and republished the allegations in the Complaint as established facts. Through social media posts and other public statements, Defendants accused O'Leary (and other O'Leary Parties) of fraud, theft, corruption, patent theft, misuse of taxpayer funds, and laundering public money, presenting those accusations as true rather than as unproven allegations. Indeed, many of Defendants' public statements went well beyond the allegations asserted in the Underlying Action, adding new accusations and inflammatory characterizations that were never alleged and in contradicted the facts alleged in the Complaint.

76.     Oleske and Brandao's actions make their purpose unmistakable. They treated the Underlying Action as part of a smear campaign rather than a lawsuit. While failing to timely serve defendants, failing to respond to motions to dismiss and motions for sanctions, and ultimately failing to prosecute their claims, they simultaneously engaged in a sustained media and social-media campaign accusing Plaintiffs of fraud, theft, corruption, patent theft, and misuse of public funds. They sought the benefits of public accusation without subjecting those accusations to meaningful judicial scrutiny. Their conduct demonstrates that the Underlying Action was pursued as a tool to generate headlines, inflict reputational harm, and pressure Plaintiffs, rather than to secure relief through the ordinary operation of the courts.

**C. The O'Leary Parties Appear Voluntarily Despite Lack of Service, Send a Rule 11 Safe Harbor Letter, and Move to Dismiss and for Sanctions, and Brandao and Oleske Refuse to Dismiss.**

77.     Brandao, through her counsel Oleske, initiated the Underlying Action in July 2025; Defendants did not timely request summonses or effect service on the O'Leary Parties.

78.     Despite Defendants' failure to timely serve—or even attempt to serve—the O'Leary Parties, the O'Leary Parties voluntarily waived service and contacted Oleske. They did so to dispose of the meritless Underlying Action at the earliest opportunity.

79.     Within a few days of emailing Oleske, counsel for the O'Leary Parties sent a Rule 11 Safe Harbor Letter to Oleske and Brandao.

80.     A Rule 11 safe-harbor letter provides a 21-day window for a party and counsel to withdraw or correct claims that lack a factual or legal basis before the movant files a sanctions motion.

31

81.     In that letter, counsel for the O'Leary Parties advised Brandao and Oleske that the claims against them lacked any factual or legal basis and appeared to have been filed for an improper purpose. The letter further cited Oleske's social-media campaign and Plaintiffs' delay in serving the O'Leary Parties as objective indicators that the Underlying Action was to generate publicity rather than adjudicate a legitimate dispute. It demanded withdrawal within 21 days, failing which the O'Leary Parties would move for Rule 11 sanctions and seek fees and costs, while expressly reserving additional claims, including malicious prosecution.

82.     Following conferral, Oleske and Brandao refused to dismiss any claim in the Underlying Action.

83.     Although the O'Leary Parties' deadline to file a motion to dismiss was January 19, 2026, the O'Leary Parties promptly filed their Motion to Dismiss, Motion for Sanctions, and Motion to Stay Discovery in early December 2025, in the hopes of disposing of the case at the earliest opportunity.

84.     Prior to this, the HerdDogg Parties separately moved to dismiss the Underlying Action and moved for sanctions. Their sanctions motion explained—based on the evidence summarized in Section B above—that Brandao and Oleske's "forgery" narrative was false.

85.     Even after being put on notice that the central premise of their case lacked any factual foundation, Brandao and Oleske refused to dismiss any claim against any party and instead continued to press the Underlying Action.

86.     By no later than November 1, 2025, Defendants possessed extensive documentary evidence demonstrating that Brandao had participated in the patent-

assignment process, received the relevant documents, executed assignments through DocuSign, and confirmed execution of those assignments in contemporaneous communications.

87.    Despite receiving this information, Defendants continued publishing and republishing accusations that Plaintiffs had engaged in fraud, theft, patent theft, corruption, misuse of Treasury funds, and other criminal conduct.

88.    Defendants therefore acted with actual knowledge of falsity or, at minimum, reckless disregard for the truth.

### D. Oleske is Questioned about the Plausibility of the Allegations and When Opposition Filings Will Be Filed.

89.    Both the O'Leary Parties and the HerdDogg Parties requested that discovery be stayed because all claims were likely to be dismissed.

90.    The Parties appeared before a District of Colorado Magistrate Judge on December 3 and December 8, 2025, to argue whether discovery should be stayed.

91.    At the December 8 hearing, Oleske was confronted with the evidence the HerdDogg Parties had filed demonstrating there was no forgery and that Brandao had, in fact, assigned all patents to HerdDogg. Ex. H.

92.    Oleske was asked, on multiple occasions, to identify which specific documents were allegedly forged, manipulated, or that Brandao could not have signed.

93.    Oleske did not provide a coherent answer.

94.    Oleske was also asked how the patent theft allegations could be plausible given Brandao was working for HerdDogg during the time the patents were transferred to HerdDogg and investors were investing into the company based on these patents.

95.    Oleske did not provide a coherent answer.

33

96.     Oleske was also asked when he would file oppositions to the O'Leary Parties' and HerdDogg Parties' pending motions.

97.     At the December 3, 2025 hearing, Oleske represented that he would file responses to the HerdDogg Parties' and the O'Leary Parties' respective Motions to Dismiss and the HerdDogg Parties' Motions for Sanctions by December 5, 2025.

98.     At the subsequent December 8, 2025 hearing, the Court inquired why the opposition briefs had not yet been filed. Mr. Oleske stated on the record that he had an "unfortunate technical mishap on [December 5]" that he had "only been able to resolve [on December 8]." He then represented he would file responses to the HerdDogg Parties' and the O'Leary Parties' motions to dismiss and motions for sanctions later that day (December 8, 2025) and acknowledged he would need to seek leave from the district court to file any untimely response. *Id.* at 3-4.

### E.   <u>Oleske and Brandao Fail to Respond to the Motions to Dismiss and Motions for Sanctions and a Show Cause Order Issues.</u>

99.     Defendants' complete failure to defend the Underlying Action confirms that it was pursued for publicity and reputational harm rather than legitimate judicial relief. After publicly accusing Plaintiffs of fraud, corruption, patent theft, misuse of taxpayer funds, and other misconduct, Brandao and Oleske were presented with motions to dismiss and motions for sanctions identifying fundamental defects in their claims and the absence of evidence supporting them. Yet Defendants never filed a response to any of those motions. Instead of defending the allegations they had broadcast to the public, they simply refused to engage the merits and delayed the inevitable dismissal for as long as possible.

34

100.    Brandao and Oleske's deadline to file a response to the HerdDogg Parties' Motion to Dismiss was December 5, 2025. They failed to respond by this deadline.

101.    Brandao and Oleske's deadline to file a response to the HerdDogg Parties' Motion for Sanctions was December 12, 2025. They failed to respond by this deadline.

102.    Brandao and Oleske's deadline to file a response to the O'Leary Parties' Motion to Dismiss was December 23, 2025. They failed to respond by this deadline.

103.    Brandao and Oleske's deadline to file a response to the O'Leary Parties' Motion for Sanctions was December 30, 2025. They failed to respond by this deadline.

104.    A Show Cause Order was issued on January 14, 2026, which stated it was "entirely unclear to this Court why Plaintiff has failed to respond, in any fashion, to two motions to dismiss and two motions for sanctions." Ex. I.

105.    In that Order, the Court stated that earlier hearings left the Court "concerned about the veracity and validity of Plaintiff's claims" and that Oleske's "interchange" with the Court "regarding exhibits supposedly showing that Docusign was nefariously used by some Defendant(s) did not ring true after close examination of the exhibits—particularly in light of Plaintiff's own admission of signing matters in Docusign."

106.    The Show Cause Order contained the following footnote: "This Court is not telling Plaintiff to dismiss this action. However, if dismissal is the most prudent course of action and not responding is some sort of slow walk to that result, it is likely to be significantly financially less painful to reach that result now rather than later. However, if Plaintiff truly wishes to pursue her claims, that is her decision."

107.    The Court's statements demonstrate that by January 2026, Defendants had been placed on unmistakable notice that both the factual and legal foundations of their

claims were highly suspect, yet Defendants still refused to dismiss their claims or retract their public accusations.

### F. The Underlying Action is Dismissed with Prejudice.

108.    Two minutes before Oleske and Brandao's deadline to respond to the Order to Show Cause, Oleske filed a declaration that attributed his failure to file any responses to inexperience managing a solo practice. The declaration requested another opportunity to file responses and did not consent to the dismissal of any claim against any defendant.

109.    The Underlying Action was dismissed with prejudice. Ex. J.

110.    In the Order dismissing the case, the Court stated: "However, when considered in light of the O'Leary [Parties'] motion for sanctions which discusses how Plaintiff used this case for months to garner media and public attention, the prejudice becomes significantly more substantial as Plaintiff lodged claims and then leveraged them for media exposure while Defendants were hamstrung in their ability to show the falsity of the claims because Plaintiff did not proceed with her own case."

111.    In the Order dismissing the case, the Court stated that an earlier "representation, made [by Oleske] on the record to a Judge of this Court, is entirely at odds with Counsel's current statement that he has 'been diligently attempting to complete responses on behalf of Plaintiff to both sets of motions during the entire interim'…any way you slice it, Counsel's representations to the Court are disingenuous."

112.    The Underlying Action terminated in the O'Leary Parties' favor on January 23, 2026. The Court dismissed the action with prejudice and closed the case, ending the proceeding on a final basis adverse to Brandao and her counsel.

**G. The Underlying Action Has Caused Substantial Harm to the O'Leary Parties.**

113.    As a direct and proximate result of Defendants' malicious prosecution and abuse of process, the O'Leary Parties have suffered substantial damages, including:

   a. attorneys' fees and costs incurred in defending the Underlying Action, which presently exceed $150,000;[2]

   b. diversion of significant executive, managerial, and professional time and resources that otherwise would have been devoted to Plaintiffs' business operations and investment activities;

   c. injury to Plaintiffs' personal and professional reputations, goodwill, and standing in the business community, together with costs incurred to mitigate and remediate that harm;

   d. disruption of existing and prospective business relationships, including the need to respond to inquiries from investors, business partners, media organizations, governmental stakeholders, and other third parties concerning Defendants' accusations;

   e. as to Mr. O'Leary and Mr. Palandjian: emotional distress, embarrassment, anxiety, frustration, and other personal harms suffered as a result of Defendants' conduct; and

   f. other economic, consequential, compensatory, and non-economic damages in amounts to be proven at trial.

114.    The O'Leary Parties are highly visible public-facing businesspeople and entities, for whom reputation and credibility are essential assets.

---

[2] On February 6, 2026, the O'Leary Parties filed a motion seeking an order to require Brandao to pay their attorneys' fees. It is still pending.

37

115. Brandao and Oleske's false statements and allegations have inflicted severe reputational harm and triggered inquiries from reporters, government officials, and the O'Leary Parties' business partners.

116. As a direct result of Defendants' accusations, Plaintiffs were required to respond to inquiries from investors, business partners, media organizations, governmental stakeholders, and other third parties regarding the truthfulness of Defendants' accusations.

117. Plaintiffs incurred substantial costs addressing and mitigating reputational harm caused by Defendants' repeated republication of false accusations.

118. Brandao and Oleske's false and sensational allegations have spread rapidly across the internet and into local media, magnifying the harm to the O'Leary Parties' reputations.

119. On July 24, 2025, Law360 reported about the Complaint.[3]

120. On November 1, 2025, self-styled "watchdog" Dustin Gawrylow reported on the Underlying Action and, based on the suit's allegations, Gawrylow claimed that "longtime readers will know that this scheme to place these taxpayer funds with Kevin O'Leary's firm has been shady since the beginning."[4]

121. Further, on November 2, 2025, reporter Grant Coursey of the Bismarck Tribune wrote an article about the Underlying Action.[5]

---

[3] https://www.law360.com/articles/2369088/founder-accuses-execs-kevin-o-leary-of-patent-forgery
[4] https://watchingnd.substack.com/p/north-dakotas-sharktank-investment
[5] https://www.inforum.com/news/north-dakota/kevin-oleary-north-dakota-wonder-fund-ceo-accused-of-fraud-in-investment-lawsuit

122.   In sum, Brandao and Oleske harmed the O'Leary Parties' reputations by filing a lawsuit filled with false allegations and claims, which was widely republished and amplified across the internet.

## H.  Oleske Has Repeatedly Misused the Courts

123.   Oleske's conduct in the Underlying Action is part of a larger pattern of filing lawsuits for publicity without actually pursuing the claims at issue.

124.   For example, in a separate *pro se* civil-rights action against New York Attorney General Letitia James and the New York State Department of Law (and others), Oleske alleged that after reporting serious misconduct within the New York Attorney General's Office and urging referral to the U.S. Department of Justice, senior leadership refused to act. He further alleged that they instead retaliated against him through defamation, unlawful leave, withheld compensation, professional isolation, termination, and a purportedly coerced defamatory media publication in punishment for whistleblowing.

125.   When the defendants in that action moved to dismiss, Mr. Oleske disregarded agreed-upon briefing deadlines. Rather than filing substantive oppositions, he instead filed a last-minute motion to disqualify counsel. The court dismissed the action with prejudice on July 21, 2025. Ex. K (Order of Dismissal).

126.   As had been done in the Underlying Action, instead of prosecuting his claims in court, Oleske devoted his efforts to promoting his allegations in the media. Months before filing his lawsuit against Attorney General James on April 10, 2024, he publicized his allegations through interviews with tabloid outlets.[6]

---

[6] Mr. Oleske continued to comment publicly on the case and its underlying accusations on X.com from late 2023 through as recent as January 21, 2025. *See, e.g.*, Jon Levine, Ex-NY Attorney General Lawyer Claims

39

127.    And again mirroring his conduct in the Underlying Action, when that case reached the merits stage, Oleske disregarded court deadlines and failed to prosecute his claims, evidencing that the action (like the Underlying Action) was pursued for publicity rather than a proper litigation purpose.

128.    Likewise, in June 2025, Mr. Oleske filed a RICO-based action in the Southern District of New York (stemming from a landlord-tenant dispute) in which he failed to request summonses for any defendant. He voluntarily dismissed that case in November 2025 without ever effecting service. *See* Ex. L (Order and Notice of Voluntary Dismissal).

129.    Oleske engaged in the same conduct in the Underlying Action as in that case. He failed to timely seek issuance of summonses or effect service of the Complaint, despite the Court's clear directives to promptly serve the defendants and the O'Leary Parties' proactive efforts to facilitate service through Rule 4(d) waivers.

### I.    <u>Brandao Had an Improper Motive for Filing Suit.</u>

130.    Brandao publicly announced in December 2025 that she had relocated to Dillon, Montana, expressly "in hopes of establishing a company that develops ear tag technology for livestock."[7] That announcement concerned the same category of livestock tracking and identification technology covered by HerdDogg's patents and demonstrates Brandao's direct commercial interest in the competitive market.

---

He Was Fired After Reporting Misconduct by Chief Prosecutor, N.Y. Post (Dec. 4, 2023), https://nypost.com/2023/12/04/metro/ex-ny-attorney-general-lawyer-claims-he-was-fired-after-reportingmisconduct-by-chief-prosecutor/; Will Potter, New York AG Letitia James Fired Lawyer Who Reported Racism, Lawsuit Claims, Daily Mail (Dec. 4, 2023), https://www.dailymail.co.uk/news/article12824481/new-york-ag-fired-racist-letitia-james.html

[7] *Ag Tech Developer Discovers Dillon, Plans Future Relationship*, Dillon Tribune (Dec. 2025), https://www.dillontribune.com/news/ag-tech-developer-discovers-dillon-plans-future-relationship/article_7cacdf88-7994-4ab8-b3c4-ed0cff63e251.html.

131.    Brandao's stated intention to build and commercialize ear tag technology for livestock—the same category of technology covered by the patents she falsely claimed were fraudulently assigned to HerdDogg—demonstrates her direct competitive interest in the result of her frivolous lawsuit. More importantly, however, that announcement evidences that her lawsuit was motivated not by a good-faith dispute over patent assignments, but by an improper competitive purpose to undermine HerdDogg's intellectual property and market position in favor of her own newfound venture.

132.    The temporal proximity of Brandao's December 2025 announcement to her litigation against HerdDogg is telling. Her public plan to establish an ear tag livestock technology company, following a campaign accusing HerdDogg of patent forgery, demonstrates that the lawsuit was deployed as a strategic tool to impair HerdDogg's market position and intellectual property rights for her own commercial advantage rather than to vindicate legitimate legal rights.

### J.    **Brandao Continues to Publicly Attack Kevin O'Leary.**

133.    Brandao has not ceased her campaign against Mr. O'Leary. To the contrary, she has migrated it to the YouTube channel of her new, directly competing venture, using that platform to broadcast attacks on O'Leary to a public audience.

134.    On June 9, 2026, Brandao published a video to that channel titled "I will NOT be erased, Mr. O'Leary."[8] The title alone confirms the video's purpose: a continued public assault on O'Leary directed at him by name.

135.    Brandao's June 9, 2026 video was not an isolated post. One week later, on June 16, 2026, she published another video to the same channel titled "A Bombshell for

---

[8] https://www.youtube.com/watch?v=Tbq6FZBvQi0

Mr. O'Leary,"[9] confirming that O'Leary remains a recurring and named subject of her content on the competing venture's platform.



136.    In the June 9 video, Brandao accused O'Leary of silencing her, stating: "When we started asking questions, you shut us down. We reached out to you, and you told us to 'fuck off.'"

137.    Brandao further accused O'Leary of misappropriating her business, stating with respect to HerdDogg: "You and your buddies at HerdDogg…you took that from me."

---

[9] https://www.youtube.com/watch?v=xLsJWKjxBE8.

138.    Brandao also disparaged the proceedings before this Court, characterizing the hearings before the Magistrate Judge as a "phantom opera that whole thing was…how propped up it was."

139.    Brandao closed with statements signaling her intent to continue: "You think you're above the law, but you're not," and "It's time…for a reckoning."

140.    These statements demonstrate that Brandao's conduct is ongoing and will not abate absent intervention by this Court.

K.  **Oleske and Brandao Abused the Judicial Process**

141.    For more than six months, Brandao and Oleske have not only subjected the O'Leary Parties to costly litigation while failing to prosecute Brandao's claims, but they have publicly accused Mr. O'Leary and the other O'Leary Parties of engaging in unlawful conduct. O'Leary has been compelled to address such allegations with corporate partners and stakeholders. All the while, Brandao and Oleske continued their efforts to delay dismissal of the Underlying Action to prolong their public boasting about the frivolous— but extremely damaging—allegations. This was a plain abuse of the judicial process. And this suit was brought to remedy this grave violation of the law.

142.    Defendants' misuse of judicial process extended beyond the mere filing of a lawsuit. Defendants repeatedly used the pendency of the Underlying Action itself as a publicity tool while simultaneously refusing to take the procedural steps necessary to advance the litigation toward adjudication.

143.    Defendants used the existence of the lawsuit to generate media attention, pressure Plaintiffs, damage Plaintiffs' reputations, interfere with business relationships, and obtain collateral advantages unrelated to any legitimate judicial objective.

43

144.    Defendants' conduct included failing to timely obtain summonses, failing to timely serve defendants, failing to respond to dispositive motions, failing to respond to sanctions motions, and continuing to publicize the lawsuit while taking virtually no action to prosecute it.

### Count I
Abuse of Process
(*Against Melissa Brandao, John Oleske, and the Law Office of John Oleske*)

145.    Plaintiffs incorporate by reference paragraphs 1–144 as though fully set forth herein.

146.    Defendants used legal process for purposes other than securing the proper adjudication of legitimate legal claims.

147.    Defendants' primary purpose was not to obtain relief through litigation but instead to:

    a.  generate publicity;

    b.  damage Plaintiffs' reputations;

    c.  pressure Plaintiffs through public accusations;

    d.  interfere with Plaintiffs' business relationships and investment activities;

    e.  obtain media attention; and

    f.  advance Defendants' personal, political, or commercial objectives.

148.    Defendants engaged in a willful misuse of judicial process after filing the Underlying Action.

149.    Among other things, Defendants:

    a.  repeatedly publicized the lawsuit and accusations through social media;

b. used the existence of the lawsuit as a platform for public attacks against Plaintiffs;

c. repeatedly promoted allegations of fraud, theft, corruption, and criminal misconduct while failing to litigate those allegations;

d. failed to timely obtain summonses;

e. failed to timely serve defendants;

f. failed to respond to motions to dismiss;

g. failed to respond to motions for sanctions; and

h. continued using the existence of the lawsuit to generate publicity while refusing to meaningfully prosecute it.

150. Defendants' own Complaint conceded that the O'Leary Parties did not become involved with HerdDogg until 2023 — years after the alleged patent forgery and wrongful termination took place. The Complaint explicitly stated the O'Leary Parties may themselves have been "victims" of the very conduct at issue.

151. Despite this, Oleske and Brandao asserted every claim in the Underlying Action against the O'Leary Parties without exception. This was not by accident. After counsel for the O'Leary Parties notified Defendants in a Rule 11 letter of the Complaint's internal inconsistencies — and made clear that all alleged misconduct predated the O'Leary Parties' involvement by several years — Brandao and Oleske declined to amend a single allegation. Their deliberate decision to initiate, and then maintain, meritless claims against parties their own pleading exculpated reflects a willful misuse of judicial process for an improper purpose, and not the good-faith pursuit of legitimate legal relief.

152. Defendants' conduct constituted a use of legal process in a manner not contemplated by law and not designed to secure a judicial determination on the merits.

153. Defendants sought to leverage the pendency of the lawsuit itself as a weapon to inflict reputational and economic harm irrespective of the outcome of the litigation.

154. Defendants' misuse of process caused Plaintiffs substantial damages, including attorneys' fees, litigation expenses, lost time, business disruption, reputational harm, and other consequential damages.

155. Defendants acted knowingly, intentionally, maliciously, and with conscious disregard for Plaintiffs' rights.

156. Defendants' conduct was attended by circumstances of fraud, malice, and willful and wanton conduct, entitling Plaintiffs to exemplary damages.

### Count II
Wrongful Institution of Civil Proceedings (Colorado Malicious Prosecution)
(*Against Melissa Brandao, John Oleske, and the Law Office of John Oleske*)

157. Plaintiffs repeat and reallege paragraphs 1–144 as if fully set forth here.

158. Defendants, acting individually and in concert, wrongfully instituted and maintained a civil proceeding against Plaintiffs in the United States District Court for the District of Colorado (the Underlying Action).

159. Brandao was the named plaintiff. Oleske signed and filed the operative pleadings and acted as Brandao's counsel of record. The Law Office of John Oleske is responsible for Oleske's acts and omissions undertaken within the scope of the representation and, independently, for authorizing and ratifying the litigation strategy described above.

46

160. The Underlying Action asserted sensational accusations, including racketeering style theories and related claims, and sought extraordinary relief and damages. The allegations targeting the O'Leary Parties were not supported by particularized facts and were instead built on speculation, guilt by association, and conclusory labels.

161. The Underlying Action terminated in the O'Leary Parties' favor. The Court dismissed the action with prejudice and closed the case, ending the proceeding on a final basis adverse to Brandao and her counsel.

162. Defendants lacked probable cause to bring and maintain the Underlying Action against Plaintiffs. No reasonable litigant or attorney could, in good faith, believe Plaintiffs engaged in racketeering, hacking, or other alleged misconduct based on the pleaded theory and its internal contradictions.

163. The Complaint's attempt to connect Plaintiffs to wrongdoing hinged almost entirely on a single phone call in which Brandao's counsel allegedly presented accusations to Mr. Palandjian. From that lone interaction, Defendants leapt to the conclusion that Plaintiffs joined a sweeping enterprise, despite the absence of facts showing any agreement, any predicate acts by Plaintiffs, or any plausible causal link between Plaintiffs and the alleged misconduct that predated their involvement.

164. The Complaint also advanced a "forgery" narrative as a central pillar of the case. That story was contradicted by the contemporaneous record showing open communications regarding preparation and execution of assignment documents and repeated notice to Brandao of the very transactions later recast as secret forgeries.

165.    Even if Defendants initially believed the allegations contained in the Underlying Action, Defendants lacked probable cause to continue prosecuting and publicly promoting those allegations after receiving documentary evidence before November 1, 2025, demonstrating the absence of any factual basis for the central forgery narrative. Moreover, Defendants knew, as demonstrated by their own pleadings, that none of the O'Leary Parties were involved with HerdDogg until years after the alleged forgery occurred.

166.    The Court's own review of the record reinforced the absence of a good faith basis. The Court expressed concern about the veracity and validity of Brandao's claims and noted that the DocuSign related narrative did not hold up upon close examination.

167.    Defendants also continued to press forward after being placed on notice of the factual contradictions and the deficiencies in their theory, including through a subsequent Rule 11 notice letter described above. Despite that notice, Defendants did not withdraw the accusations, narrow their claims, or proceed in a manner consistent with a genuine effort to litigate the case on the merits.

168.    Defendants acted with malice, meaning for an improper purpose rather than a good faith effort to obtain relief. The Underlying Action was used as a publicity vehicle and as leverage to harm Plaintiffs' reputations, impose litigation costs, and create headlines, not to secure an adjudication on a properly supported claim.

169.    Objective facts show the improper purpose. While failing to take basic steps required to prosecute the case, Defendants engaged in a sustained public campaign centered on Mr. O'Leary's name and public profile. Oleske repeatedly posted about Mr. O'Leary on social media, including inflammatory insinuations and taunts, and Brandao

48

likewise posted memes and content designed to amplify the lawsuit. During the same period, Defendants delayed ordinary litigation steps, including service-related actions, and then failed to respond to multiple merits and sanctions motions, effectively stalling the proceeding while keeping the accusations in public circulation.

170. Plaintiffs suffered damages as a direct and proximate result of Defendants' wrongful institution and malicious maintenance of the Underlying Action, including but not limited to:

a. attorneys' fees and costs incurred to defend against the Underlying Action and to address sanctionable conduct, including fees in excess of $150,000;

b. substantial reputational harm, including inquiries and requests from reporters, government officials, and business partners;

c. diversion of executive time and business resources;

d. costs incurred to mitigate and remediate reputational injury, including crisis and communications expenses; and

e. other consequential damages to be proven at trial.

171. Plaintiffs are entitled to recover all damages proximately caused by Defendants' conduct, together with prejudgment and post judgment interest and allowable costs.

172. Plaintiffs also seek punitive damages to the extent permitted by Colorado law and applicable federal procedure, based on Defendants' willful and wanton conduct and improper purpose.

**WHEREFORE**, Plaintiffs request judgment against Brandao, Oleske, and the Law Office of John Oleske, jointly and severally, for all compensatory damages, presumed

damages, special damages, exemplary damages, interest, costs, pre- and post-judgment interest, and such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: June 29, 2026

Respectfully submitted,

**NEIMAN MAYS FLOCH & ALMEIDA PLLC**

/s/ Jeffrey A. Neiman
Jeffrey A. Neiman
Florida Bar No. 544469
jneiman@nmfalawfirm.com
Brandon S. Floch
Florida Bar No. 125218
bfloch@nmfalawfirm.com
550 S Andrews Ave, Suite 720
Fort Lauderdale, Florida 33301
Telephone: (305) 400-4269
Fax: (954) 688-2492

**WILLIAMS & SERIO LLC**

/s/ Mark L. Williams
Mark L. Williams
Elizabeth Serio Williams
1401 Lawrence St., Suite 1600
Denver, CO 80202
Phone: 303.656.9919
Email: mlw@williamsserio.com
Email: esw@williamsserio.com

*Counsel for O'Leary and Palandjian,*